IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **LORRAINE M. PÉREZ-VÉLEZ** | **CIVIL CASE NO.** |
| Plaintiff | |
| V.S. | |
| **BELLA VISTA HOSPITAL, INC.** | DISABILITY DISCRIMINATION |
| Defendant | **(JURY TRIAL REQUESTED)** |

# COMPLAINT

**TO THE HONORABLE COURT:**

**COMES NOW** plaintiff, through the undersigned attorneys and very respectfully **SETS FORTH** and **PRAYS**:

**I.     JURISDICTION AND VENUE**

1.1.   Insofar the instant case arises under federal legislation, this Honorable Court has subject matter jurisdiction over the instant action pursuant to 28 U.S.C. § 1331, to hear claims arising under the Title I of the Americans with Disabilities Act, 42 U.S.C, § 12101, et seq. (hereinafter referred to as "ADA").  Supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367, over claims arising under Puerto Rico Law Number 44 of June 2, 1985, 1 P.R. Laws Ann. § 501, et seq. (hereinafter referred to as "Law 44").  All requisite administrative remedies with the U.S. Equal Employment Commission have been duly exhausted.

1.2.   The District of Puerto Rico is the proper venue in which to file this action, as per 28 U.S.C. § 1391(b)(2), insofar the events giving rise to this action occurred within said district.

## II. THE PARTIES

2.1. Plaintiff Lorraine M. Pérez-Vélez is a United States citizen, she is single and is domiciled in Mayagüez, Puerto Rico.

2.2. Defendant Bella Vista Hospital, Inc. is a non-profit corporation organized under the laws of the Commonwealth of Puerto Rico, affiliated to the Seventh Day Adventist Church that operates a hospital in the Cerro las Mesas ward in the City of Mayagüez, Puerto Rico.

## III. THE FACTS

3.1. Plaintiff was born with a rare congenital condition called "Multiple Enchondromatosis", commonly referred to as "Ollier's Disease".

3.2. Plaintiff's condition is characterized by the proliferation of intraosseous benign cartilaginous tumors (known medically as "enchondroma") develop close to growth plate cartilage, or, in plain English, the growth of benign tumors that affect bone growth and development.

3.3. In plaintiff's case, the disease has affected her growth, resulted in the amputation of one of her legs (she walks with a prosthesis) and the shortening of all of her extremities, particularly her right arm, effects that are visible to the casual observer's naked eye.

3.4. The disease severely impairs plaintiff in the performance of several daily life activities including, without limitation walking, manipulating objects with her hands and exerting large amounts of force.

3.5. Notwithstanding the limitations that her condition represented, plaintiff has always strived to live life to the fullest and with great courage and determination, she was able to graduate from the School of Nursing at the University of Puerto Rico's Mayagüez Campus and to become a registered nurse.

3.6. During the year 2012, plaintiff had her first professional experience as a registered nurse when she was retained by the San Jorge Children Hospital in Santurce, where she was assigned to work with pediatric cancer patients.

3.7. After about a year of working at San Jorge, plaintiff developed an acute allergy to latex, which was problematic because she is required to wear latex gloves in the discharge of her duties.

3.8. Due to the allergic reaction and in order to treat it properly, plaintiff resigned from her position at San Jorge and moved back to her hometown of Mayagüez.

3.9. After receiving intensive treatment, plaintiff was able to control her allergy and thus began hunting for a new job.

3.10. On April 2014, plaintiff was interviewed for a position at Hospital Bella Vista in Mayagüez and several days after said interview, plaintiff was informed that she had been selected.

3.11. Since the day of the employment interview, the hospital's Human Resources Director and the Nursing Director both had knowledge of plaintiff's condition.

3.12. Plaintiff was initially assigned to work on the first floor of the hospital, which hosed post-operatory patients, as well as patients that received chemotherapy.

3.13. At the conclusion of the 3-month probationary period, plaintiff's performance was evaluated and she obtained a 90% score, without any complaints from patients or from fellow staff members, thereby becoming a permanent employee.

3.14. On mid-December 2014, plaintiff was transferred to the pediatric ward, under the direct supervision of Ms. Wilma Garib.

3.15. During the month of January 2015, some of plaintiff's co-workers complained before Ms. Garib about plaintiff's "canalization" or "catherization" (i.e., her handling of an intravenous catheter), arguing that plaintiff came too close to the patients.

3.16. The only reason that plaintiff had to come closer to the patient than other nurses was due to the shortened size of her arms.

3.17. No patient ever complained about plaintiff catherization technique nor did said technique (which more than a technique was the only way in which plaintiff could perform the task) ever pose any risk to the patients.

3.18. In a very demeaning tone, Ms. Garib questioned plaintiff's knowledge, saying that plaintiff appeared to have no experience.

3.19. Notwithstanding that the reason why plaintiff had to approach patients a little bit more than other nurses was evidently her disability, she sent her to the endoscopy area so that she could "learn" the appropriate technique.

3.20. On the month of February 2015, plaintiff was indeed sent to the endoscopy area where she performed her assigned tasks without any complaint and her supervisors expressly told her that her canalization technique was correct,

understanding that the fact that plaintiff had to come a little bit closer to the patients was due to her disability.

3.21.    When plaintiff was sent back to the pediatric ward, her supervisor asked her about her experience in the endoscopy area, to which she replied that she had enjoyed her time at endoscopy because her co-workers there made her feel as part of the team, something that never happened at the pediatric ward.

3.22.    Upon being informed that plaintiff had never been incorporated into the pediatric ward nursing team, plaintiff's supervisor merely said that this was just the way that the nurses in that floor usually behaved, that is, that it normally took them some time to integrate new people into the team but that if plaintiff was patient, she would eventually be accepted as part of the team.

3.23.    On March 2015, as she reached the 3-month benchmark in the pediatric ward, plaintiff's work performance was again evaluated and she obtained an 82% score.

3.24.    In discussing her evaluation results, plaintiff's supervisor told her that she would have obtained a higher score if she had been more integrated into the work team, notwithstanding the fact that the supervisor was well aware that the rest of the pediatric ward's nursing staff simple did not want to treat plaintiff as one of their own and in fact barely spoke to her.

3.25.    During the meeting in which the evaluation was discussed, plaintiff told her supervisor that on many occasions, her co-workers would criticize her work in front of patients and their parents (thereby affecting plaintiff's image of professional competence).

3.26. Plaintiff also recalled how she was excluded from everyone of the team's social activities, mentioning as an example an incident in which the pediatric ward team won a pizza meal as a prize and she heard how her co-workers talked amongst themselves about going to eat that pizza and indeed, going to eat the pizza while leaving plaintiff alone to care for the whole ward and offering her the pizza leftovers on the next day.

3.27. Plaintiff's response to plaintiff's legitimate concerns was that she should not worry too much, particularly given the fact that she was about to go on vacation leave and that once she came back from vacation, everything would be all right.

3.28. At this point all that plaintiff's supervisor had done since December 2014 was to credit other employees' unjustified criticism of plaintiff's work, based solely on the way that plaintiff's disability forced her to do certain things differently (i.e., the canalization of IV lines) and allow those same co-workers to alienate and isolate the plaintiff.

3.29. On May 2015, on the day that she returned from vacation leave, plaintiff was immediately asked to meet with her immediate supervisor, the Human Resources Director and the Nursing Director.

3.30. During this meeting, plaintiff was **orally** informed that she was being terminated from employment, as defendant did not give her a termination letter.

3.31. When plaintiff inquired as to the reasons for which she was being given a pink slip, defendants' representatives stated that it was because of her co-workers'

complaints about how her disability forced her to deal with patients, as well as a few other isolated events.

3.32. In terminating plaintiff from her job, defendant failed to follow its own personnel regulations, by which it was bound, specially those provisions dealing with progressive discipline.

3.33. Because, *inter alia*, plaintiff's problems began and ended with the unjustified criticism of her work technique, as forced by her impairment, it is clear that the actual motivation behind her ouster was her impairment, which also explains the lack of a written termination letter and the disregard of institutional procedures.

3.34. After her ouster, plaintiff has been unable to find comparable employment and was unemployed for some months before she found any new employment.

3.35. More importantly, the discriminatory chain of events that marked plaintiff's short tenure with Hospital Bella Vista left her with profound feelings of anger, frustration, sadness, anxiety, disappointment and bitterness.

3.36. The economic and emotional damages inflicted upon plaintiff by defendant's violation of Title I of the ADA and Puerto Rico Law 44 are estimated in an amount of no less than $1,000,000.00.

3.37. If a jury were to render a verdict that exceeded the maximum allowed under federal law, the remained of the award should be imputed to Law 44 and doubled pursuant to said statute, as contemplated in <u>Campos-Orrego v. Rivera</u>, 175 F.3d 89 (1st Cir. 1999).

3.38. In penalizing plaintiff for performing certain tasks differently from other nurses, due to her disability, defendant grossly disregarded and wantonly violated plaintiff's rights under the ADA for which reason defendant should be punished with an award of punitive damages in an amount of no less than $500,000.00.

3.39. Plaintiff is entitled to reasonable attorneys fees, assessed under the lodestar method, as per 42 U.S.C. § 12205.

3.40. Plaintiff hereby expressly and unequivocally invokes her right, under the Seventh Amendment to the U.S. Constitution, to a jury trial an all claims so triable.

**WHEREFORE** it is respectfully requested from this Honorable Court that the relief requested in the instant action be hereby **GRANTED**.

In San Juan, Puerto this 12th day of May, 2016.

**RESPECTFULLY SUBMITTED**,

**M.L. & R.E. LAW FIRM**
513 Juan J. Jiménez St.
San Juan, Puerto Rico 00918
Tel (787) 999-2972
Fax (787) 751-2221

*S/Jorge Martínez Luciano*
**JORGE MARTINEZ LUCIANO**
USDC-PR Number 216312
e-mails: squalus@rocketmail.com
jorge@mlrelaw.com

*S/Emil Rodríguez Escudero*
**EMIL RODRÍGUEZ ESCUDERO**
USDC-PR Number 224312
e-mail: emil@mlrelaw.com